**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

TARIQ K. SHABAZZ,

    Plaintiff,

v.

Case No. 1:26-cv-01032-BMB

FRANK LaROSE, in his official capacity,

et al.,

    Defendants.

FILED

JUL 09 2026

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO CLEVELAND

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT LaROSE'S MOTION TO**

**DISMISS AND REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

**I. INTRODUCTION**

The Secretary's motion rests on a single premise repeated as though repetition were reasoning: that Shabazz I decides this case. It does not. Shabazz I concerned a statewide United

States Senate race governed by a flat 5,000-signature statute and a 5-to-1 ratio. This case concerns the Cuyahoga County Executive — one of only two such offices in Ohio — governed by a turnout-derived formula producing an 83-to-1 ratio, in an election where the major party's nominee faced no competitive primary and advanced on a flat 50-signature filing. The Secretary does not rebut these differences. He concedes each of them—the office, the ratio, the empty primary—and then declares them immaterial by fiat. Under the fact-intensive Anderson-Burdick standard, a defendant does not get to concede the facts and win the inquiry. The motion to dismiss should be denied and the preliminary injunction granted.

## II. THE ELEVENTH AMENDMENT DOES NOT BAR THIS ACTION.

The Secretary concedes, as he must, that Ex parte Young, 209 U.S. 123 (1908), permits prospective injunctive relief against a state official. He argues only that the relief here is "in effect retroactive." He is wrong. The relief sought is an order placing Plaintiff on the November 3, 2026 general election ballot — an election that has not yet occurred. An order operating on a future election is prospective by definition. The test under Ex parte Young is whether the relief is prospective in effect — whether it remedies an ongoing or future violation — not whether some administrative event preceded the suit.

The Secretary's own authority proves the point. He relies on Committee to Impose Term Limits v. Ohio Ballot Board, 275 F. Supp. 3d 849 (S.D. Ohio 2017), where the plaintiff sought to "declare as null and void a prior action." That is retroactive relief — an order undoing a past act. Plaintiff seeks no such thing. He does not ask the Court to declare the Board's determination null; he asks the Court to enjoin the continuing and future exclusion of his name from a ballot not yet

printed. The distinction is dispositive. If the Secretary were correct, no ballot-access plaintiff could ever obtain relief once any administrative deadline passed—which would nullify Ex parte Young in the very context where it is most needed. Election deadlines always precede the election. A rule that immunizes the State whenever a deadline has run is not a reading of Ex parte Young; it is its repeal.

The language the Secretary quotes from Plaintiff's clarification motion—that the harm is "no longer prospective but actual"—describes the ripening of the injury, not the nature of the remedy, which remains forward-looking: placement on a future ballot.

### *The Board of Elections' separate assertion of immunity fails for the same reason.*

The Cuyahoga County Board of Elections separately contends that, as the Secretary's appointed representatives under R.C. 3501.06(A), it shares the Secretary's Eleventh Amendment immunity, citing Beiersdorfer v. LaRose, 397 F. Supp. 3d 1037 (N.D. Ohio 2019), and Hunter v. Hamilton County Board of Elections, 850 F. Supp. 2d 795 (S.D. Ohio 2012). Neither case supports dismissal of this action; both, read past their captions, support Plaintiff. In Beiersdorfer, Eleventh Amendment immunity barred only the plaintiffs' state-law separation-of-powers claim; the federal constitutional claims were dismissed on the merits, not on immunity grounds. The court there reaffirmed that Eleventh Amendment immunity "does not attach to suits filed against a state official for purely injunctive relief enjoining the official from violating federal law." That is precisely this suit: a federal claim for prospective injunctive relief. And Hunter, while treating the board as an arm of the state for certain functions, expressly recognized that such a suit "could still proceed against the individual board members under the Ex parte Young doctrine." Plaintiff's

claim for prospective relief thus survives regardless of the Board's asserted immunity. To the extent necessary, Plaintiff's claim proceeds against the members of the Board in their official capacities under Ex parte Young, exactly as Hunter contemplates.

## III. SHABAZZ I DOES NOT CONTROL, AND THE AMENDED COMPLAINT STATES A CLAIM.

Anderson-Burdick requires the Court to weigh "the character and magnitude" of the burden against "the precise interests" the State asserts, considering the extent to which those interests make it necessary to burden the plaintiff's rights. Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); Burdick v. Takushi, 504 U.S. 428, 434 (1992). This is a fact-intensive, as-applied inquiry. The Secretary's motion asks the Court to resolve it on the pleadings by treating Shabazz I as dispositive of facts Shabazz I never addressed.

### A. *The Anderson-Burdick framework requires strict scrutiny of a severe burden, and the burden here is severe.*

Anderson-Burdick is not a single test but a sliding scale. The rigor of judicial review rises and falls with the severity of the burden the challenged regulation imposes. Where a restriction is "reasonable" and "nondiscriminatory," the State's "important regulatory interests" will generally justify it. Burdick v. Takushi, 504 U.S. 428, 434 (1992). But where the restriction imposes a "severe" burden on First and Fourteenth Amendment rights, it "must be narrowly drawn to advance a state interest of compelling importance." Id.; Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). The threshold question, then, is where on that continuum this burden falls—and that question cannot be answered, as the Secretary would have it, by the label "1%" alone.

The burden here is severe for three cumulative reasons. First, its magnitude: an independent candidate must gather eighty-three times the signatures required of a major-party candidate for the identical office—not a marginal inconvenience but a structural wall. Second, its mechanics: the signatures must be collected in person, in ink, one witness at a time, by a single circulator per petition, and filed no later than the day before the primary election, with the entire collection effort necessarily completed across the winter months preceding the May primary. Third, its effect: the burden operated here to exclude the only independent candidate entirely, producing an uncontested general election. A regulation combining an 83-to-1 disparity, uniquely restrictive collection mechanics, and total exclusion of the challenging candidate is severe under any reading of Burdick. Strict scrutiny applies, and the State must show the requirement is narrowly tailored to a compelling interest. It cannot.

Even below the "severe" threshold, Anderson-Burdick requires the State's interests to be weighed against the burden and shown "necessary." Anderson, 460 U.S. at 789. The State's asserted interests either did not materialize (primary validation) or are already satisfied twentyfold (demonstrated support). A burden this heavy, justified by interests this attenuated, fails at any level of scrutiny.

### B. The magnitude of the burden is categorically greater.

Shabazz I involved a 5-to-1 ratio. This case involves 83-to-1. The Secretary concedes the number. Because magnitude is the first variable under Anderson, an eighty-three-fold disparity is not the same claim the Court resolved in Shabazz I; it is a different burden requiring a fresh weighing. A ratio the Court never evaluated cannot have been decided by the Court.

### C.  The State's sole justification — primary validation — did not occur here.

The justification courts have accepted for requiring more of independents is that party candidates earn ballot access through a competitive primary that validates public support. Miller v. Lorain Cnty. Bd. of Elections, 141 F.3d 252 (6th Cir. 1998), rested on that premise. Here it is absent: the 2026 Democratic primary for Cuyahoga County Executive was uncontested, and the nominee advanced on the same flat 50-signature filing, with no opponent and no additional showing of support. The Secretary invokes Miller's "apples to oranges" metaphor while omitting that Miller compared a fruit that existed—a competitive primary that validated party support—to one that, in this race, does not. The metaphor collapses when one of the two things being compared is absent. When the validating mechanism does not operate, the asserted interest cannot justify the burden. The Secretary offers no answer; he simply pronounces the primary's absence "of no consequence." But under Anderson it is the entire consequence. A justification that depends on a process that did not occur cannot justify anything.

### D.  Miller and the cited cases involved different offices and lesser disparities.

Miller upheld the 1% requirement as applied to a congressional district, comparing an independent to partisan congressional candidates. Phillips and Wilcoxson involved countywide judicial races. None involved the county executive — an office existing in only two of Ohio's 88 counties — and none involved an 83-to-1 disparity in a race with no competitive primary. These decisions do not resolve the question presented.

### E.  The Secretary's higher-percentage cases prove Plaintiff's point.

The Secretary counts percentages and ignores schemes. He cites Jenness v. Fortson, 403 U.S. 431 (1971), and cases upholding 3% and 5% requirements, reasoning that Ohio's 1% must

therefore be lighter. But Jenness upheld Georgia's 5% because of the leniency of the surrounding scheme: the Supreme Court emphasized the 180-day circulation period, the absence of any restriction on who could sign, and the availability of write-in voting. Jenness, 403 U.S. at 438-40. The burden is the whole scheme, not the bare percentage.

Ohio's scheme is harsher on every dimension Jenness found decisive. An independent must file the entire petition no later than the day before the primary election. Ohio Rev. Code § 3513.257. Ohio permits no electronic or remote collection; every signature must be in ink, Ohio Rev. Code § 3513.261, and personally witnessed by a circulator attesting under penalty of election falsification, Ohio Rev. Code § 3501.38(E)(1); and each petition paper may be circulated by only one person, Ohio Rev. Code § 3513.05. Because the deadline forces collection across the Northern Ohio winter, the practical burden is severe: according to the National Weather Service's 1991– 2020 normals for Cleveland, the December-through-March collection window averages roughly 29 to 39 degrees Fahrenheit and bears the bulk of Cleveland's 63.8 inches of normal annual snowfall. A one-percent requirement collected in ink, by hand, one witness at a time, across a Great Lakes winter, and filed the day before the primary, is not made constitutional by decisions upholding higher percentages under schemes that permitted none of those hardships. The number is smaller; the burden is not.

Nor is the day-before-the-primary deadline a neutral detail. In Anderson v. Celebrezze itself, the Supreme Court struck down Ohio's early filing deadline for independent candidates, holding that "the reasons for early filing for a primary candidate are inapplicable to independent candidates in the general election." 460 U.S. at 799-800. Ohio's requirement that an independent complete and file his entire petition by the day before the primary replicates the very burden

Anderson condemned in this State: it forces the independent to organize, canvass, and file before the major-party field is even settled, for no reason applicable to a general-election candidacy.

***The State's "modicum of support" interest is not merely satisfied; it is exceeded many times over.***

The State's central justification, drawn from American Party of Texas v. White, 415 U.S. 767, 782 (1974), is that a signature requirement ensures a candidate has demonstrated a "significant modicum of support" before appearing on the ballot. A modicum is a small amount— the constitutional floor a State may require to keep frivolous candidacies off the ballot. That interest is not implicated here, because Plaintiff has demonstrated support far beyond any modicum. The Board validated 1,030 signatures of registered Cuyahoga County voters. That is more than twenty times the fifty signatures the State deemed sufficient to establish the major-party nominee's support for the same office. If fifty validated signatures suffice to show a modicum of support for the major-party candidate, 1,030 cannot be constitutionally insufficient to show it for Plaintiff.

This exposes the disconnect at the heart of the State's position. The purpose of a signature requirement is to measure a modicum of support; Plaintiff has provided twentyfold that modicum; yet the requirement excludes him anyway. When a ballot-access threshold operates to exclude a candidate who has plainly demonstrated the very support the threshold exists to verify, the threshold is no longer serving its asserted interest—it is functioning as a barrier untethered from any legitimate purpose. That is the definition of a burden that fails Anderson-Burdick scrutiny. The

State cannot defend a requirement by reference to an interest that Plaintiff has already satisfied many times over.

### *Controlling Supreme Court precedent condemns precisely this kind of disproportion.*

The Secretary's brief does not mention Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173 (1979), but that decision is directly on point and controls the analysis. There, a unanimous Supreme Court struck down an Illinois scheme in which a percentage formula produced the result that an independent candidate needed more signatures to reach the ballot for a local office (Mayor of Chicago) than for statewide office. The Court held: "If that interest is adequately served by a 25,000-signature requirement in a statewide election, the same interest cannot justify a larger requirement in a smaller election." Id. at 186. The Court further held that the State "must adopt the least drastic means" in the ballot-access context, and that where a smaller number of signatures in a larger unit already serves the State's interest, a heavier requirement in the smaller unit is "clearly not the least restrictive means." Id. at 185-86. Plaintiff's amended complaint pleads a violation of both the First and Fourteenth Amendments, and the ballot-access disproportion condemned in Socialist Workers Party arises under the same constitutional guarantees and the same Anderson-Burdick framework that governs this action; the decision reinforces, rather than supplements, the claim already before the Court.

The parallel to this case is exact. In Shabazz I, the statewide independent threshold was 5,000. Here, the threshold for the far smaller electorate of a single county office is 4,164—a number approaching the statewide figure, for an office serving a fraction of the statewide constituency. The State's asserted interest—ensuring a modicum of serious support—is the same interest at issue in Socialist Workers Party. Under that decision, if the interest is served by the statewide requirement, it cannot justify a disproportionate requirement for a smaller office. The

Secretary's response—that the formula simply produces this number because of Cuyahoga's turnout—is precisely the justification the Supreme Court rejected: "Historical accident, without more, cannot constitute a compelling state interest." Id. at 186. A number generated by the mechanical operation of a generic formula, never calibrated to this office, is the very "historical accident" Socialist Workers Party holds insufficient.

Moore v. Ogilvie, 394 U.S. 814 (1969), reinforces the point. There the Court invalidated a signature-distribution requirement because it allowed sparsely populated areas to control ballot access while densely populated areas could not, offending equal protection through population disparity. The same population-driven distortion operates here: the identical statute yields 1,983 signatures in Summit County and 4,164 in Cuyahoga for the same office, a disparity generated solely by population and turnout, not by any legislative judgment about the office itself.

### F. The Summit County comparison exposes the arbitrariness the Secretary concedes.

The Secretary defends the Summit-Cuyahoga difference by explaining that Cuyahoga's population is 2.3 times greater, so the turnout-based requirement "bears a similar ratio." That concession defeats him. The Secretary cannot invoke population sensitivity to defend one threshold and population indifference to defend the other. If population and turnout are the legitimate measure of required support, then the flat 50-signature major-party threshold — identical in both counties, untethered to population or turnout — is the arbitrary outlier. The Secretary cannot justify the independent requirement by its sensitivity to population while defending a major-party requirement that ignores population entirely. The two standards are incommensurable, and the State's asserted interest in "demonstrated support" cannot rationalize measuring one class against countywide turnout and the other against nothing.

## IV.  THE PRELIMINARY-INJUNCTION FACTORS FAVOR PLAINTIFF.

The Secretary correctly notes that in First Amendment cases the likelihood-of-success factor generally predominates. Ronan v. LaRose, No. 26-3272 (6th Cir. 2026); Fischer v. Thomas, 52 F.4th 303, 307 (6th Cir. 2022).

Ronan does not aid the Secretary. It applied Anderson-Burdick to § 3513.07's good-faith party-membership declaration and found no severe burden because the requirement left the candidate free to run, vote, endorse, and switch parties—truthfully. That candidate had sufficient signatures and was removed solely for party insincerity, and the credited interest—preventing party raiding—has no application to an independent. Ronan never addressed signature-quantity requirements.

The four preliminary-injunction factors—(1) likelihood of success, (2) irreparable harm, (3) harm to others, and (4) the public interest, Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012)—each favor Plaintiff, and are addressed in turn.

The Secretary correctly states that a preliminary injunction is an extraordinary remedy requiring a "clear showing" of entitlement. Winter v. Natural Res. Def. Council, 555 U.S. 7, 22 (2008); Benisek v. Lamone, 585 U.S. 155, 158 (2018). Plaintiff embraces that standard rather than avoiding it. The facts material to this motion are not in dispute—the Secretary concedes the 83-to-1 ratio, the structural uniqueness of the office, the uncontested primary, and the 1,030 validated signatures. On that undisputed record, the legal conclusion follows clearly: a severe, as-applied

burden, justified by interests that did not materialize or are already satisfied, cannot survive Anderson-Burdick. Where the operative facts are conceded and the constitutional defect appears on their face, the "clear showing" standard is met, not defeated.

### *First, likelihood of success.*

Parts II and III establish a strong likelihood of success: a severe, as-applied 83-to-1 burden Shabazz I never evaluated, in a race where the competitive primary did not occur, condemned by Socialist Workers Party. Because this factor predominates in First Amendment cases, the State's own framing works against it—if one factor decides this motion, it is the one on which Plaintiff is strongest.

### *Second, irreparable harm.*

The loss of First and Fourteenth Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Exclusion from the ballot is not compensable after the fact: once the November 3, 2026 ballot is printed and the election held, no later judgment can restore Plaintiff's place on it or the voters' opportunity to choose him. The Sixth Circuit recognizes denial of ballot access as irreparable harm. Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 593 (6th Cir. 2006). The State's response— that Plaintiff was excluded lawfully and therefore suffers no cognizable harm—merely restates its merits position; it does not answer the harm factor. If Plaintiff is right on the merits, the harm is irreparable, and the State offers no independent reason to conclude otherwise.

Nor can the availability of write-in status substitute for a place on the printed ballot. The Supreme Court rejected that substitution in Anderson, quoting Lubin v. Panish: a candidate

"relegated to the write-in provision would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot." Lubin v. Panish, 415 U.S. 709, 719 n.5 (1974); Anderson, 460 U.S. at 799 n.26 (noting that in the 1980 Presidential election, only 27 write-in votes were cast in the entire State of Ohio). Write-in access is not ballot access.

### Third, substantial harm to others.

Placing one qualified independent candidate on a general-election ballot months before the election harms no one. The State invokes the interest in "orderly elections," but adding a single name to a ballot that is not yet printed disrupts no order. No other candidate is displaced; no voter is disenfranchised; no deadline that binds other candidates is disturbed. The only "harm" the State identifies is being enjoined from enforcing its statute—but that harm exists in every constitutional challenge and cannot, by itself, tip this factor, or no injunction against an unconstitutional election law could ever issue.

Nor does the timing of relief counsel restraint. The concerns that animate Purcell v. Gonzalez, 549 U.S. 1 (2006)—judicial changes to election rules on the eve of voting—are absent here: the general election is months away, the ballot is not printed, and the relief sought is the addition of a single name, not an alteration of any rule governing how the election is conducted. Granting relief now, well before any ballot-finalization deadline, serves orderly administration rather than disrupting it.

The Board of Elections disposes of both remaining factors in a single conclusory sentence: that "conversely," an injunction would harm third parties and "the public interest in maintaining stable and consistent election laws." The Board never identifies what harm one additional qualified

candidate inflicts on the electorate—because there is none. The harm runs the other way: it is exclusion, not inclusion, that leaves 1.2 million residents a single name for their county's highest office. The Board's "conversely" points in the wrong direction. And its stability rationale proves too much: if consistent enforcement alone defeated injunctions, no unconstitutional election law could ever be enjoined. Stability is no virtue when what is kept stable is a constitutional violation.

***Fourth, the public interest.***

The public interest lies in preventing constitutional violations and in preserving genuine electoral choice. G&V Lounge v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994). Without Plaintiff on the ballot, the approximately 1,245,873 residents of Cuyahoga County face an uncontested election for their county's highest executive office—a single name on the ballot for a county of over a million people. There is no public interest in an election that offers no choice. The State's countervailing interest in "stable and consistent election laws" is not served by enforcing an unconstitutional one; the public interest is never served by the enforcement of a statute that violates the Constitution.

On balance, every factor favors relief. The factor that predominates in First Amendment cases favors Plaintiff decisively, and no other factor weighs meaningfully against him.

## V.  CONCLUSION

The Court should deny the motion to dismiss and grant the preliminary injunction. At minimum, because the claim is as-applied and fact-intensive, dismissal on the pleadings is inappropriate. The Secretary treats a case about a different office, a different ratio, and a functioning primary as though it answered questions it never confronted. It does not. The facts the Secretary concedes are the facts that decide this case.

Respectfully submitted,

Tariq K. Shabazz

Pro Se Plaintiff

5455 N. Marginal Road, Apartment 509

Cleveland, Ohio 44114

Dated: JULY 9 , 2026